All right. Mr. Archer. Thank you, Your Honor. I would like to reserve five minutes for my reply. What I want to talk about first... Are you Mr. Archer? Yes, Richard Archer, yes. What I wanted to talk about first is the scope of this Rens case in time. It's brooded about here that this case is a clone of the Walmart case. First, I want to talk about time. The second thing I want to talk about is whether there was adequate representation based upon the standard Walmart used, used in this court in Epstein and Mitsubishi, those cases. So I want to conclude talking about the procedure that was followed here. Now, first, as to the date of release, the date of the releases in the Walmart case released prior to January 1, 2004. And Walmart says expressly, page 110, conduct occurring after December 31, 2003 is not precluded from being the subject of further suit. Our complaint was filed in June 1902, but it was dismissed in March 2004, which was obviously after the dismissal date. And in our complaint, our second amended complaint in paragraph 12, we allege specifically these merchant deposit fees, which we're complaining, these merchant deposit fees have harmed and continue to harm the interests of retailers, businesses, professions, and merchants, including those online throughout the United States. Again, in paragraph 15, defendants have acted, continued to act, refused to act, and to continue to refuse to act, and it's the continue to act and the continue to refuse to act to which I refer. Mr. Archer, is it your position then that Judge White was correct except as to the actions alleged in the complaint after January 1, 2004? I know. My position is that he was wrong in this regard and others. All right. In other words, if this court were to accept this, I'd go back and file a case starting January 1. Yeah. Is that all you want? No. I want more. Yeah, we're afraid of that. Get at the candy store. Now, the second thing is – Would you have to amend your complaint to go back and say notwithstanding the Wal-Mart settlement, the defendants have continued to do this conduct since 1231-03? I think when you allege this kind of damage and continuing, I think it goes right up to the time of trial. You wouldn't even have to amend your complaint to – I would – between – You and I. I would want to – I would amend the complaint for other reasons. Yeah. Let me do it. Okay. You've got some other stuff in there. Okay. After this, we file another case for other plaintiffs, and it's – Judge White dismissed it on other grounds. Is that before us? Pardon? Is that case before us? No, but it's a related case. Okay. I'll get it. That's fine with me. All right. Now, so also part of this Wren's Appeal, which has nothing to do directly with Wal-Mart, is that we had a complaint in the case for what I call joint marketing or discrimination in selling. This is – and it's joint discrimination. This was stricken from the Wren's complaint, and it was stricken before the Wal-Mart settlement. And let me – How did it get stricken? Did you strike it? It's just – Not I. Okay. Over my dead body. Okay. It was stricken over my objection. By whom? Judge White. And you're appealing from that order? Yes. See, I won the rest of it. He held that what the defendants were doing was a violation of the antitrust laws. But he struck this other violation that I alleged, this joint marketing. Why isn't that, as to actions before 12-31-2003, released in the Wal-Mart release? Let me get to that, will you please? Pardon me. This is what I'm – I'm wanting to say that this was not part of the clone. Why do you say that? Because the court in Wal-Mart said so. The court in Wal-Mart said, at page 104, specifically noted that the claims in Wren's had all been dismissed except our claims for direct price-fixing by Visa and MasterCard. Expressly said that. Now let me give you the second reason why. If you're alleging joint price-fixing discrimination, you have adversaries plaintiffs, the plaintiffs who got the benefits of the discrimination and the plaintiffs who didn't. And the way the Wal-Mart court decided that Wren's was adequately represented, it states at page 109, before the claim of preclusion may be applied to the claim of an absent member, it must be demonstrated that the invocation of the bar is consistent with due process. Now that's, I think, the same rule that this court uses. In other words, you have to see that the lead plaintiffs are not – are not exempt from all the other plaintiffs. Mr. Archer, enlighten me. Whether the claims were part of a complaint or had been stricken is not determinative of the scope of the release, is it? The release reads, including without limitation claims which have been asserted or could have been asserted in this litigation which arise under or relate to any Federal or State antitrust law. How can you have a broader release than that? And why is that release in its general terms not conclusive upon you? Because we didn't sign the release. That has nothing to do with it. You were a member of the class. No. The second thing we have to have, we have to be adequately represented. That was determined at the fairness hearing. It wasn't determined. Not to your liking, but it was determined. No. It wasn't determined as to our joint price fixing, because that was not in the complaint, and there was nobody representing that, and there's nobody that could have, because since it was a discrimination claim, they were adverse. The lead plaintiff's counsel would have been adverse to some of the plaintiffs. Even though a co-lead counsel represented a small merchant, he still represented Walmart. If you want to break it up as plaintiffs and let them represent different groups, you have subclasses and you get different attorneys for the subclasses, but they didn't do that here. So they had two problems here, Your Honor. This claim of price fixing discrimination had been dismissed from our complaint, and if it had been there, they would have had to worry about getting representation, because the lead plaintiffs representing Walmart and so forth obviously were the ones who were getting the favorable treatment for price discrimination. So bear in mind that we were not given an opportunity to opt out of the settlement. This isn't like the Massachusetts case where they were complaining about a settlement that they had not opted out of. So that's why I'm saying nobody could agree to this settlement as Your Honor read it unless he adequately represented RINs, and I'm saying there's no way he could, because that claim was not included in the Walmart hearing. The judge and the Court of Appeals specifically noted it at page 104. Page 104 of what? Of the Court of Appeals opinion. New York. Yes, the Second Circuit. Yes. And as I say, you'll notice there when he holds that RINs was adequately represented, every time he holds that, he's holding that because he says the lead plaintiffs in Walmart includes the same class as RINs. Well, that would not have been true if this claim of discriminatory price fixing was before the court. Explain briefly to me what you mean by the claim of discriminatory price fixing. Who was discriminating and who was price fixing in plain language? Okay. Let me try. I'll try Judge White's language. This is what he said in the order, page 20 of the published opinion. Plaintiffs allege that defendants set different deposit fees or ranges of deposit fees for different classes of customers of acquiring banks, presumably by setting different interchange fees for these different classes. Now, this is why I'm appealing. The judge ruled that out. He said the allegation of price differentials between customers does not in itself state a claim for antitrust violations. He cites two cases, Soslaw and USM Corp. That's what they hold, but they're talking about discrimination by one trader. This is not a combination. The clue to the Sherman Act Section 1 violations are a combination. A single trader could set a price. That's not what I'm worried about. I'm saying that when two people, two or more people get together and discriminate, they're doing it by agreement, and that's joint marketing. And the case we cite in support of that is a case involving Sunkist. The Ninth Circuit has had several Sunkist cases, and in one, it was challenged. It has to be a co-op, you know, under Capra-Volstead. And in one case, two of the packing houses were private companies, and this court said that was all right. The Supreme Court reversed, and it's automatically an antitrust violation because our marketing, Sunkist is marketing for all these packing houses, and it doesn't have the right to do that unless it's excused under a statute. You were citing to me page 20 of the published opinion by Judge Hoyt? Yes. I'm having difficulty finding that because my Westlaw copy has 13 pages. Could you give me the citation for that, please? Maybe I have a different ruling. I'm sure I have it here. He could furnish it later. Maybe he could furnish it later. Yeah. You can give it to me later, counsel. I don't want to use up your time. I should have it here. And I made these notes myself. Now, I wanted to show one other thing about this discrimination, which I say the court in Walmart could not find that there was adequate representation because paragraph 8 of the settlement agreement provides that beginning on August 1st and ending in December, December 31st, that they will reduce these interchange rates for a certain period of time, and the court approves that. It roughly reduces them by one-third. Well, I know of no court that has ever held that if we are right in what we allege and what Judge Von Walker said in Brannon, which we cited in our letter to the court, that what these Visa and MasterCard was doing was a per se price-fixing reservation, how the two-thirds that the Visa and MasterCard were charging for this period of time were price-fixing themselves. And if they said that they could reduce them, it was a good thing to reduce them and save $800 million to the merchants. What about the $1,600,000,000 that they were keeping for themselves? And I know of no case where they have authorized a price-fixing violation like that. Now, what the court did in Walmart, you'll see they made a remark about me that said I waived this in the Court of Appeal. How could I waive an illegal antitrust violation in the Court of Appeal? Assuming that I did, although I gave them the opinion in our objection, which said that price-fixing of the interchange by Visa and MasterCard was illegal, which was what Judge White had held. So how could they not know it? Well, the judge says this, he said the defendants say this was a matter that could be waived, that it's give and take. As though they said we'll let you get all your profits from price-fixing, but you're going to have to give up time. We can trade those two. You can't trade those two. You can't trade a price-fixing violation. Now you could trade how much you think they're worth. If we're talking about damages in the past, you could talk about that. But here, they're enjoining this tying, which is what we claim Walmart was about, but they're letting this price-fixing of the interchange fee continue, and not only that, it started before they even had the hearing on the fairness so that this price-fixing, which was in the settlement agreement, went from August 1st to December 31st. We didn't get the judge's decision authorizing it in the district court until December 19th. So even if the court could justify this kind of thing, which I don't think it can, and I don't know of any case that said it could, up until December 19th, they were obviously violating the law. If there's any truth into what, well, as far as the legality of it, it goes back to what the district court here in another case, Brannon, said. They said, applying Freeman against San Diego realtors, that this kind of price-fixing was illegal per se. I have 42 seconds left. Thank you. Kennedy. We'll give you two minutes because I interrupted you. Good morning. May it please the Court. Marie Fiala, representing Apolli Visa USA and appearing this morning for the other Apolli's MasterCard International, Wells Fargo Bank, Bank of America, and U.S. Bank. As well, I will address the questions that Mr. Archer has. Pardon me. I can't hear you. Is that better? Is that better, Your Honor? Yeah, a little bit better. Just raise your voice. Would you like a glass of water to help you? There you go. I think I'm fine. I'll just try to speak up. Thank you. I'll begin with the question that Mr. Archer raised, and that is the allegation regarding joint marketing that was stricken by the district court below earlier in the proceedings. That order is not currently appealed from. That issue was not specified as the issues presented for review by this court. As I understand the argument Mr. Archer is making, it's that in the earlier dismissal in April of 2003, where Judge White struck certain allegations in the complaint regarding joint marketing, I believe Mr. Archer is asserting that those allegations, therefore, could not have been released by the Walmart settlement because they were not present in the case. They were no longer present in the case. Judge White, in striking those allegations, observed, and I don't have the Westlaw site, but I do have the FSUP site for the Court's reference, that that decision is reported at 259 FSUP 2nd, 992, and at page 1002 of that reported decision. The district court observed that this joint marketing allegation was simply intended to provide, may simply be intended to provide factual support for the contention that the interchange fees are not set by competitive forces. So the court observed that it might provide context for the central interchange challenge, but that the language in and of itself did not state an antitrust claim. And as providing context for the interchange challenge, that allegation is encompassed within the scope of the Walmart release, just as the central interchange challenges in this case are, because as the district court found in New York, the interchange allegations were a virtual clone of the interchange allegations that made up a part of the Walmart litigation. So the joint marketing allegations are nothing different. They're simply context or elaboration on the interchange allegations. And in any event, that order is not presently before the Court on review. And if it were before the Court, discrimination between merchants, all of whom were part of the Walmart class, could not have been litigated there without separate representation. Isn't that right? Well, the Walmart, first of all, Mr. Archer had the opportunity to make all of the allegations he's raising this morning about purported conflicts among merchants and members of the Walmart class in the New York courts. And he did not make those arguments in the New York courts. The case was fully the settlement agreement and release were fully scrutinized by the district court based on a comprehensive record. There were no such allegations of conflict among larger or smaller merchant class members made in the New York court by any of the objectors. There were a small number of objectors out of 5 million class members. Some 18 objectors appeared. Fifteen of those were professional objectors, as the Court called them. There were no allegations of conflicts among class members made. The district court, which was quite familiar with the record based on seven years of having had that case litigated before it, found after an extensive inquiry at which Mr. Archer appeared and represented his clients at the fairness hearing that the settlement was fair, reasonable, and accurate. The Second Circuit affirmed that finding. And I think the central point to bring to the Court's attention this morning is that Mr. Archer and his clients have had their day in court in challenging that settlement. They are here this morning effectively asking this panel to reopen and reevaluate the reasonableness of a settlement that has been approved by another district court in another circuit and affirmed on appeal. In a proceeding in which Mr. Archer personally appeared, filed briefing excuse me, filed objections, appeared and argued at the settlement hearing, and made virtually these identical arguments on appeal to the Second Circuit. In fact, the Raines plaintiff's arguments on appeal in the Second Circuit are almost verbatim identical on the briefs to the briefs filed with this Court. In a class action context, that is all the particular portion of the Second Circuit decision which ratifies what you just told us. In terms of the conflict? In terms of Mr. Archer making the same allegations regarding the necessity to have separate representation in the fairness hearing. Mr. Archer did not. I don't want to misstate Mr. Archer's arguments in the Second Circuit. The Second Circuit briefing is a part of the record in this case. I thought there might be some particular portion you'd like to point to, but are you saying now he could have raised those points in the New York court in the Second Circuit, he was present, but he didn't, or are you saying he did raise those points and they were ruled upon? He, Mr. Archer raised all of the points included in his briefing in this matter to the New York courts, and those claims were considered and rejected on the merits. He did not make the argument that he has made here this morning regarding a purported conflict among the Wal-Mart class members. But the Wal-Mart class was ably represented in the New York proceedings. The court commented favorably on the quality of the representation by class counsel who had vigorously, I believe the court said aggressively and feverishly, litigated the case and negotiated the settlement. There was no allegation that class counsel or the class representatives were in any position with which might have created a conflict or a divergence of interests between the class representatives and any of the absent class members. Has anything happened since that hearing which changed the situation between the class members and the Wal-Mart class to make it appear that now there is a conflict but it wasn't there? No, Your Honor. In fact, these plaintiffs participated in the Wal-Mart settlement on equal terms with all other class members. There is nothing in the record, nothing factual in the record that suggests any adversity of interests or conflict of interest such that the class representatives might have been said to have sold out interests of absent class members in favor of their own settlements. And those are the kinds of circumstances to which the courts look when considering whether a collateral attack on a class settlement ought to be entertained. In the normal course, this type of collateral attack is flatly impermissible. It is barred by principles of collateral estoppel because of the opportunity which Mr. Archer availed himself of to make the same argument before the New York courts. Collateral estoppel applies fully in the class action contexts so long as the certifying and settlement court used normal, appropriate due process safeguards, such as the case that I just described. May I ask you a question? Do you agree that as to any acts which took place after January the 1st, 2004, the release portion of which I read a moment ago does not reach? No, Your Honor. That is, in fact, a more complicated question than it appears. It is true that the release on its terms releases claims based on conduct that occurred prior to January 1, 2004. There are now actually a large number of cases pending, and they have just been consolidated before Judge Gleeson in a multidistrict litigation. There are some 47 new actions challenging what we call the interchange fees. Forty of them are class actions. There is not a consolidated complaint on file yet. And so no determination has been made yet whether the release would or would not apply to bar some or portions or all of the claims asserted. There are certainly arguments that could be made that the conduct is the same and that, therefore, the release applies. But as I said, there is no determination at this point whether and how the release would apply to the new interchange cases. If Mr. Archer's clients continued after January 1, 2004, to be merchants who accepted Visa and MasterCard payment cards, they presumably would be members of the classes that have been alleged in the new multidistrict litigation in New York, and, therefore, their interests would continue to be fully represented with respect to post-January 1, 2004 claims. But Judge Grisey has not ruled yet as to whether the release will bar claims after January or for conduct after January 1, 2004. There is no ruling. There is not even a complaint, an operative complaint yet. The case is that Mr. Archer be barred in any way from pursuing his claims in this litigation for conduct which took place after January 1, 2004. Those claims were not pleaded in this complaint, Your Honor. Well, but you do remember that Mr. Archer read from paragraphs 12 and 15 regarding continue to harm and continue to act. Do you think that that's not the case? The claims which were alleged in this complaint were alleged in June of 2002 when the complaint was filed and are based on conduct prior to June of 2004. Mr. Archer's complaint sought future damages and future injunctive relief based on past conduct. He did not, nor could he, have alleged claims for conduct after January 1, 2004. Except by amendment, which he did not request from the district court. Should we now allow an amendment? Your Honor, as I said, the interchange cases currently pending, the large number of them are class actions in New York, will fully and adequately protect the interests of the class members, including Mr. Archer's clients in this matter. Assuming that they met the otherwise were qualified and met the standards for class membership. So I see nothing to be gained, nor any efficiency resulting from allowing an amendment in this matter to allow Mr. Archer to proceed with post-January 1, 2004 claims. But on the record as it now stands, Mr. Archer sought only damages and injunctive relief in the future based on conduct that was the subject of the Walmart release. But paragraph 15 says the defendants continue to act. And I believe that was the basis for the claim for injunctive relief that was asserted, Your Honor. But Mr. Archer did not request leave of court to amend his complaint to, to, to plead claims for post-January 1, 2004 conduct, as opposed to relief. And in answer to Judge Fletcher's question, you say that we should remand with a restriction to allow and to amend because he'll be perfectly protected in Judge Cressay's action. Assuming his clients currently are merchants who accept Visa and MasterCards, their interests will be protected in this very large multidistrict litigation that is just getting off the ground as to claims post-January 1, 2004. Maybe Mr. Archer will address that in his rebuttal. But I would return to the point. Yes, Your Honor. It would seem that we shouldn't preclude his doing that in this suit. If he wishes to do it, it may be costly, it may be inefficient, but that's not the point, Your Honor. I would return to the point, Your Honor, that he, Mr. Archer did not request that relief in the court below, and therefore, there's no basis in the record for his appeal with respect to any amendment. He simply did not seek leave to amend below. Let me ask this. Judge Bea, in a sense, asked it wanting to know whether in the Second Circuit opinion there's anything specific which states that Mr. Archer's claims about discrimination were covered and dismissed. No, Your Honor. As Mr. Archer was speaking, I actually referred to the part of the Second Circuit decision that he referenced. And I'm having trouble finding the page, but I believe that the reference that the page that he cited as to merely observed that in the Raines case, in this case, Mr. Archer had alleged claims based on interchange and that certain other claims had been dismissed. The Court made no specific reference to the joint marketing allegation or to the basis for the dismissal, and certainly made no discussion at all about whether the joint marketing allegation would or would not have been encompassed by the Walmart release. But as the district court below in this case observed, the joint marketing allegation was nothing more than, if you will, window dressing or context for the central interchange allegation. The joint marketing allegation in the complaint said basically that the defendant association's visa and MasterCard set different interchange, set interchange centrally, and that that is a Section I violation, and that they set different interchange levels for different merchants. That's what Mr. Archer calls joint marketing. It's that there's not a one-size-fits-all interchange fee, but that different interchange rates are applied, for example, to a grocery store as opposed to a Walmart discount retailer. And that was what Mr. Archer called a joint marketing violation. The district court found that that allegation in and of itself was nothing more than an elaboration or context for interchange, for the central interchange claim which has been released. And is that you claim that's not on appeal to us? That is correct, Your Honor. That is not specified. The district court's opinion of decision of April 21 is not included in the excerpts of record, and that joint marketing issue or any aspect of that order, for that matter, is not specified among the statement of issues presented for review by this court at this time. I would return to the point that Mr. Archer makes about adequacy of representation of his interests, his clients' interests in the Walmart settlement, which appears to be the ground on which he now seeks to collaterally attack the findings of the New York courts. It is true that there is a requirement of adequate representation, but that requirement does not mean what Mr. Archer, which it purports to according to Mr. Archer. It does not mean that the claims that have been released must have been actually litigated in the settlement court or in the certifying court. Adequacy of representation means that there must have been an alignment of interests between class members. It does not mean proving vigorous pursuit of the released claim. That is the statement, that is the Second Circuit's holding, rejecting exactly this argument made by Mr. Archer in the New York proceedings. And Mr. Archer does not dispute that his member, that his plaintiff, that his clients were members of the Walmart class, that they shared fully and equitably in the Walmart settlement proceedings. And there is no suggestion in the record of any kind that the claims of absent class members in the Walmart case might have been sold out or somehow that there was a failure of representation as to the absent class members' interests. Those are the kinds of circumstances that are found in the cases on which Mr. Archer relies. The Molsky case, for example, the prior case was a B-2 injunction class with no right of opt-out. The settlement released money damages as well, and the subsequent plaintiff had the court found that class counsel actually, that the class counsel received many times the amount in settlement that the named plaintiff did and that there was actually collusion between class counsel, the class representatives and the defendants, the settling parties. The Stevenson case, which is the other case on which he relies, again, there was a disparity of interests between the objecting party and the class representatives who settled the case. The injuries of the objecting party arose after the expiration of the settlement fund for Agent Orange injuries, so that he received no compensation and, in fact, the settlement did not apply to him and other similarly situated persons who discovered their injuries after January 1, 1994. We have nothing like that in the record here. There is no suggestion that these plaintiffs were inequitably treated. And in the normal course, the Federal courts will not revisit and will not reopen a class settlement approval by another court unless there is some showing of this kind, which doesn't exist here. Mr. Archer has had his day in court. He presented his arguments. They were considered thoughtfully and disposed of, and this Court, we respectfully submit, should not reopen the settlement approval. Your time has expired. Thank you. Thank you, Your Honor. Your Honor, at no time did I bring before the Wal-Mart court the question of the dismissal of the joint marketing discriminatory price-fixing claim because it had been dismissed prior to that settlement. And I was wrong in the page. I said it was page 20. It's page 1002. Thank you.  Thank you very much. Thank you very much, Your Honor.
judges: B. Fletcher, Thompson, Bea